## Downton v. The Yaeger Milling Co.

*(Circuit Court, E. D. Missouri.   March 28, 1879.)*

1. LETTERS PATENT—MIDDLINGS FLOUR.
    Certain instruments, set out in full in the opinion delivered by the court, *held* not to amount to such an assignment by Downton, a patentee for a process patent, of which the claim is for manufacturing middlings flour by passing the middlings through or between rolls, of his right as patentee, as to preclude him from suing third parties who infringe his patent.

In Equity.

*W. G. Rainey*, for complainant.

*G. M. Stewart*, for respondent.

DILLON, C. J., *(orally.)*   We are prepared to announce our conclusions in the case of *Downton* v. *The Yaeger Milling Co.* This is a bill in equity by the complainant, as the patentee in a certain patent granted by the United States for an invention,—in character a process patent,—against the Yaeger Milling Company for infringing the

monopoly or rights granted by that patent. The issues have been made up, and proofs have been taken. We ordered an argument on the question of assignment and estoppel, since that question, if decided in one way, would end the case against the complainant and obviate the necessity of the court going into the proofs on the merits.

Some time about the year 1872—that, perhaps, is common knowledge in this country now—there was brought into successful operation and practice the manufacture of flour of a superior quality or grade, from what is known to millers as the "middlings." Before that time, in America, at all events,—although it was shown by the proofs in another case that they had much more intelligent conceptions on this subject abroad, and especially in France,—in America, however, prior to that time, what is known as the middlings, which constitute the most nutritious portion of the grain, by reason of a greater relative portion of gluten,—a nitrogenous substance which is more nutritious than the other parts of the wheat,—by what is known as the "new process," were shown to be susceptible of making flour, as I said before, of a superior quality, and had the effect of revolutionizing the process of manufacturing flour very largely, and, at all events, to bring the spring wheat of the country, for economical purposes, in more favorable competition, if not on a par, with the winter wheats of the country. Now, when that improvement was practiced or brought into successful operation a year or two afterwards, the United States granted to Mr. Downton, the complainant in this case, what is known as a process patent, as distinguished from a patent for a mechanical device, which sufficiently appears from the claim which he made. After describing the state of the art, as required, he proceeds to state in the claim what he insists is covered by his invention, and for what he wants a monopoly or patent. Now, that claim is this: "The hereinafter-described process of manufacturing middlings flour by passing the middlings through or between rolls." The middlings are a comparatively coarse product, and instead of regrinding them at once, as had been theretofore practiced, Mr. Downton claims a patent, and procured one, for passing them between rolls, (instead of comminuting or triturating them and reducing them to an impalpable powder,) which has the effect of flattening certain impurities, and they are enabled by a sifting process to eliminate said impurities before the middlings are reground; that is the process, viz., by the use of rolls as an intermediate step or process in the art of manufacturing flour. So he says:

"I claim, as new; the herein-described process of manufacturing middlings flour by passing the middlings, after their discharge from a purifier, through or between rolls, and subsequently bolting and grinding the same for the purposes set forth."

The point is that this is a process patent, as distinguished from a patent for a mechanical device. This difference in the law concerning patents for inventions is one of great moment. If it is a patent for a process, the particular mechanical device by which the process is worked is not patented; any machinery or mechanical device for executing the patent is not embraced in it. Generally a patent for a process, for that reason, is very much more valuable than a patent for a mechanical device, because whatever way you make any alteration in the device changes the nature of it, if it be for a combination patent; if you add an element, or omit an element, such patent is easily evaded. But not so with the process patent, which has no concern with the *specific* mechanical devices or contrivances by which the process is worked.

Now, Mr. Downton, after securing that patent, and, as shown by the proofs, being an intelligent man, and with an ingenious mind, also contemplated the procuring at this time of a patent for machinery for the purpose of working his process; for instance, this patent is to be worked, as it appears, by rolls and rollers, and he contemplated at this time the procuring of a patent for rolls—for a mechanical device, or machinery to operate his patent, and also for what is known as a middlings duster, known as "Downton's Peerless Middlings Duster.".

Now, after he had obtained this process patent, and when he had these patents for machines in contemplation, he fell in with the firm of Allis & Co., of Milwaukee and Chicago, who it seems had a large establishment for the manufacture of machines of various kinds. Downton having the patents,—that is, having one and contemplating getting others,—it was supposed they could make an arrangement to act together, (Allis & Co. to manufacture the rolls and duster, and avail themselves of Downton's patent for the right or process,) and they made a series of contracts. I will allude to each of them very briefly. The only one now material to be considered is the one I first read:

"For and in consideration of the sum of $125, to me in hand paid, I hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wisconsin, their successors and assigns, the exclusive right to manufacture and sell rolls for crushing grain or middlings, or other substances, No. 162,157, dated April

20, 1875, [which is the only process patent that was granted, and which was the only patent that had been granted to Downton at that time,] for the full life of such patent, and any reissues, extensions, or improvements thereon, except that the shop-right to manufacture and sell in the state of Minnesota, but not elsewhere, is granted to O. A. Pray, of Minneapolis; said Allis & Co. also having an equal right to sell in said state. Dated at Milwaukee, Wisconsin, this twenty-fourth day of January, A. D. 1876.

[Signed]　　　　　　　　　　　　　"ROBERT L. DOWNTON."

The next contract of the same date and a part of the same transactions, is an agreement:

"For and in consideration of the sum of $125, to me in hand paid, and the further payment of the patent fees thereon, I do hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wisconsin, their successors and assigns, the exclusive right to manufacture and sell a certain machine for which I agree to obtain a patent, to be known as 'Downton's Peerless Middlings Duster,' for the full term of the patent, or any improvement or extensions thereon; and, upon the obtaining of said patent, I hereby agree to execute such assignment.

[Signed]　　　　　　　　　　　　　"ROBERT L. DOWNTON."

The third agreement on the same day is as follows:

"Witnesseth, that whereas, by certain agreements, bearing even date herewith, the rights to the exclusive manufacture of 'Downton's Peerless Middlings Duster,' and rolls for crushing grain, etc., patented by said Robert L. Downton, have been conveyed by him to said Allis & Co., * * * it is hereby agreed that the engagement of said Robert L. Downton of his exclusive services to said Allis & Co., at the above rate of $1,500 per annum, may be ended upon notice of six months by either party, or without notice, by payment of the sum of $750 in money; and it is understood that said Downton is not entitled to take away any patterns, or otherwise, of any of the machines made by said Allis & Co."　　　　　[Signed by the parties.]

With this addenda:

"In case of the termination of the above engagement by death, or other casualty, the right to sell the machines referred to in the above agreement shall revert to the heirs or successors of R. L. Downton, the manufacture continuing in said Allis & Co., to whom all orders are to be sent."

[Signed by the parties.]

That was in January, 1876. Downton, the patentee under this patent, went into the employ of Allis & Co. under this agreement, and while in Allis & Co.'s employment he made a contract as the representative of Allis & Co., and of himself, in reality, as connected with Allis & Co., by virtue of this contract, with the Yaeger Milling Company to put certain rolls, which had been manufactured, or were to be manufactured, by Allis & Co., into their mill, which they were erecting at that time in this city. And two sets of rolls, manufactured by

Allis & Co. pending the continuing of the arrangement between them and Downton, were put into the mill under that contract which had been made by Downton, representing Allis & Co. as well as himself. After these had been put in, Allis & Co. failed, and proceedings in bankruptcy were commenced against them. *That,* Downton seemed to have conceived, had the effect to end these three contracts between himself and Allis & Co., and, at all events, from that time all business relations or connections between them ceased, as it is claimed. Allis & Co. were not adjudged bankrupts. They made an agreement or composition with their creditors, and proceeded in business. So that any rights they had under that contract they still have. Thus, the bankruptcy, by reason of its termination in this manner, ceases to be material in ascertaining the relations of the parties. As to the special point now under consideration, we assume that the proofs show that Yaeger & Co. had notice of the bankruptcy, and that Downton claimed that he had terminated this arrangement, and that Downton insisted that the whole contract between himself and Allis & Co. was at an end, and that all rights thereunder had reverted to him. After this, and after the alleged notice of the character I have described, Allis & Co., claiming that the contract was still in force and that they were the assignees of all rights of Downton, continued to manufacture these rolls, and the Yaeger Milling Company put in several other sets of rolls in their mill.

Now, this is a bill by Downton, as the holder of the process patent, to which I have adverted, against the Yaeger Milling Company for infringement of his rights under that patent in the use of these rolls, under the circumstances I have stated. This is an outline of the case.

Now, one question, on which we ordered an argument, is whether, under these circumstances, whatever may be Downton's rights as between himself and the rest of mankind, or as between himself and Allis & Co., who are not parties on the record in this suit, as Mr. Downton has never had judicial settlement or adjustment of his rights in a direct proceeding with Allis & Co.—whatever might be the rights of Mr. Downton as against anybody else—the question is whether he was not equitably estopped, as against Yaeger & Co., from insisting that they infringed his patent, by reason of the circumstances I have stated. The counsel have been heard on that, and we agree (Judge Treat and myself) that so far as the two rolls are concerned that were put in by Downton himself during the pendency of his relations with Allis & Co., and for which they paid Allis & Co.,

he is estopped to claim that the use of those rolls is an infringement of his patent. That, I think, is plain enough; for not only did Yaeger & Co. buy these rolls for the express purpose of using them of Downton as well as Allis & Co., but Downton took his proportion of the amount paid therefor. Therefore, as respects those rolls, it is too plain for controversy that Downton is estopped.

Now, as to the others purchased by Yeager & Co., after it is claimed they had notice that a controversy had sprung up between Allis & Co. and Downton, and were put in without Downton's consent, and after notice that, "If you do that, I (Downton) will hold you responsible." If these are the facts, then they went on at their peril.

Now, if the proofs shall show that they made a valid contract for, or bought and paid for, these rolls before they received notice of Downton's rights, then these additional rolls will stand on the same footing as the others; but otherwise, not. Another material point argued, and to be decided, is this: that Downton had disabled himself from maintaining a suit against anybody by reason of the assignment I first read. It being claimed that that was an *assignment* (as distinguished from a license) of his *entire rights* under the patent to Allis & Co., and therefore that he had made an entire unconditional assignment of his rights, and could not bring an action against anybody for invading those rights, which he could have brought had he not made the assignment. So the question is whether this is an assignment of his rights under that process patent:

"In consideration of the sum of $125, to me in hand paid, I hereby sell, assign, and set over to Edward P. Allis & Co., of Milwaukee, Wis., the exclusive right to manufacture and sell rolls for crushing grain or middlings or other substances."

Now, he had no patent for rolls. He had no more right to make rolls than anybody else in the world. He had a patent for a process.

This is not a suit between Downton and Allis & Co., but a third party, against whom Mr. Downton, as patentee, has brought a suit. He produces his patent, and claims that they have infringed it. They come in and say, "You cannot maintain this suit, because you have assigned *all* your rights, under this process patent, to another party, and, if we are liable to any one, we are liable to them, *i. e.*, Allis & Co., and not you." The defendants are setting up this contract as an assignment, and, in my view, in order to enable them to avail themselves of it as such, it must appear on its face to be a complete assignment of Downton's rights; if not, he can maintain this suit if

not otherwise equitably estopped. Now, did he by this *instrument assign* his rights under the process patent? He says, "I grant to them the exclusive right to manufacture and sell rolls for crushing grain or middlings, or other substances, * * * which right or process to manufacture and sell rolls is secured to me by said patent." This seems to be based on a mistake from the begining to the end. It is said, however, by the defendants that he meant to convey something, and you must put a construction on it so as not to defeat the operation of the instrument. But my judgment is, since this does not operate intrinsically or *ex proprio vigore* as an assignment by Downton of his rights under that patent, they remain in him, and will remain in him as against Allis & Co., until Allis & Co. shall secure, by the decree of a court in equity, if thereto entitled, a specific execution of an assignment of the process to them.

In conclusion let me add that I only decide:

1. That the instruments executed by Downton to Allis & Co. do not, nor does either of them, amount to such an assignment of the rights of Downton, as patentee, as to disable him from suing persons generally who infringe his patent if the same is a valid patent.

2. But whether he can maintain a suit against the purchasers of rolls from Allis & Co., who use the same in such a manner as to infringe his patent, will depend upon the principles of the law of estoppel. Applying these principles, it sufficiently appears that he is estopped as to the first set of rolls; but whether he is estopped as to the others will depend upon the special facts and circumstances which will be considered when the cause comes on for final hearing.

Judge Treat does not agree in the above view as to the effect of the assignment and as to estoppel, but that being my view the case will be disposed of on this point in accordance with the views I have expressed, if it shall turn on them. We have not considered the merits. They will stand for a further argument and hearing.

TREAT, D. J. Putting a proper construction on these agreements, and taking into consideration the fact that Downton, over his own name, published to the world that whoever bought rolls of Allis & Co. should have the right to use the process, I think there is an estoppel in this case, as Yaeger did buy his rolls of Allis & Co., some of which rolls were put into the mill under Downton's own superintendence.

So far as the contracts and agreements are concerned, standing as they do now, and holding that this contract is designed to convey something, the plaintiff cannot recover, as the right to use is given

to any person purchasing rolls of Allis & Co., and these defendants did purchase rolls of Allis & Co. The controversy, primarily, should be between Allis & Co. and Downton, setting up all these matters, as between them, to take out of them or him any pretended right either may have.

But, so far as third persons are concerned, who acted on the faith of Downton's conduct, publications, and the recorded assignment, they cannot be proceeded against for the use of this process. To get rid of any difficulty in this matter, he should proceed directly against Allis & Co. to have the original agreement reformed, so as to correct the mistakes which may be, possibly, detected by looking at the cotemporaneous agreements between the parties. In other words, there should have been a suit against Allis & Co. to reform the agreements, as between themselves, and having them reformed, sue any one who thereafter might infringe the process.

On the trial, at the proper time, the merits will be considered to determine as to the validity of the process patent.